J-S19034-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: INVOLUNTARY TERMINATION OF PARENTAL RIGHTS TO E.L.M.T.W., A MINOR | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.L.T., MOTHER | : : : : : | |
| | : | No. 233 MDA 2023 |

Appeal from the Decree Entered January 9, 2023
In the Court of Common Pleas of Lebanon County
Orphans' Court at No(s): 2022-758

| | | |
|---|---|---|
| IN RE: INVOLUNTARY TERMINATION OF PARENTAL RIGHTS TO J.J.M., A MINOR | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.L.T., MOTHER | : : : : : | |
| | : | No. 234 MDA 2023 |

Appeal from the Decree Entered January 9, 2023
In the Court of Common Pleas of Lebanon County
Orphans' Court at No(s): 2022-00760

| | | |
|---|---|---|
| IN RE: INVOLUNTARY TERMINATION OF PARENTAL RIGHTS TO J.E.M., A MINOR | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.L.T., MOTHER | : : : : : | |
| | : | No. 235 MDA 2023 |

Appeal from the Decree Entered January 9, 2023
In the Court of Common Pleas of Lebanon County
Orphans' Court at No(s): 2022-00761

| TERMINATION OF PARENTAL RIGHTS | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| TO Z.K.C.M,. A MINOR | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: S.L.T., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 236 MDA 2023 |

Appeal from the Decree Entered January 9, 2023
In the Court of Common Pleas of Lebanon County
Orphans' Court at No(s): 2022-759

| IN RE: INVOLUNTARY TERMINATION | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| OF PARENTAL RIGHTS TO | : | PENNSYLVANIA |
| J.O.M.T.W., A MINOR | : | |
| | : | |
| | : | |
| APPEAL OF: S.L.T., MOTHER | : | |
| | : | |
| | : | |
| | : | No. 244 MDA 2023 |

Appeal from the Decree Entered January 9, 2023
In the Court of Common Pleas of Lebanon County
Orphans' Court at No(s): 2022-00762

BEFORE:  BENDER, P.J.E., McLAUGHLIN, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.: **FILED AUGUST 11, 2023**

S.L.T. ("Mother") appeals from the decrees involuntarily terminating her parental rights to five of her children: her daughters, J.O.M.T.W. (born in August 2017), and E.L.M.T.W. (born in September 2021); her twin daughter

and son, J.J.M. and J.E.M. (born in June 2018) ("the twins"); and, finally, her son, Z.K.C.M. (born in June 2020) (collectively "the Children").[1]  We affirm.

The family first became known to Lebanon County Children and Youth Services ("CYS") in August 2020 due to reports alleging substance abuse and physical abuse.  *See* N.T., 9/26/22, at 8-9.  Specifically, CYS received reports relaying concerns that, *inter alia*, that Mother and Father (collectively "Parents") were "smoking marijuana while driving with J.O.M.T.W. in the car . . .."  *Id*.  CYS also received a report alleging physical abuse of J.J.M.  *See id*.  Additionally, in September 2020, CYS received a report that Mother and V.E.M. were, *inter alia*, inappropriately disciplining and injuring the Children by "grabbing [them] by the arms and picking them up by the arms."  *Id*. at 9.  J.O.M.T.W., the twins, and Z.K.C.M. were adjudicated dependent in November 2020, but not placed.  *See id*. at 12-13.  Mother was indicated as a perpetrator of child abuse in the order adjudicating the four eldest children dependent.  *See id*. at 12.  Following an incident in June 2021 where Mother

---

[1] The court additionally involuntarily terminated the parental rights of T.W. ("Father") to E.L.M.T.W. and J.O.M.T.W.  We address Father's appeals separately at Nos. 136, 137 MDA 2023.  The court also terminated the parental rights of any unknown father of E.L.M.T.W.  No unknown father filed a separate appeal.  The father to Mother's other three children, V.E.M., did not participate in the proceedings below.  *See* N.T., 9/26/22, at 7-8; *see also* N.T., 1/9/23, at 151; Trial Court Opinion, 2/16/23, at 5.  Neither V.E.M. nor any unknown father appealed from the termination of his parental rights.  *See* Trial Court Opinion, 2/16/23, at 5.  Lastly, Mother has a sixth child not subject to this appeal and who did not have a dependency or termination matter open at the time of these proceedings.  *See* N.T., 1/9/23, at 76.

fled with the Children, as well as allegations of physical abuse of J.E.M.,[2] CYS obtained emergency protective custody for J.O.M.T.W. and her siblings, all of whom were placed in June 2021. *See id*. at 15-17. The female siblings were placed together in a foster home, and the male siblings were placed together in a separate foster home. *See* N.T., 1/9/23, at 52. In August 2021, the court established permanency goals of return to parent or guardian with concurrent goals of adoption. *See*, *e.g.*, N.T., 9/26/22, at Ex. 7, p. 6.

CYS received reports thereafter about domestic violence between Parents, who were expecting another child:

> . . . [Mother] had reported an incident to [CYS] where [Father] had choked her, cocked a gun and shot it towards her. She also had . . . marks and bruising on her belly while she was pregnant with [E.L.M.T.W.,] and she admitted they were from [Father]. [Mother] [got] a [Protection From Abuse Act order] against [Father], but then dropped it to talk with him about the baby.

N.T., 9/26/22, at 18. In October 2021, CYS obtained emergency custody of E.L.M.T.W., approximately a month after her birth, and placed her with her older sisters. *See id*. at 21-23, 25.[3] Father was incarcerated at the time. *See id*. at 20-21, 24, 82.[4] The court adjudicated E.L.M.T.W. dependent in

_____

[2] The CYS caseworker described bruises and scratches to J.E.M.'s face and forehead. *See* N.T., 9/26/22, at 16.

[3] Mother failed to notify CYS of E.M.L.T.W.'s birth, and CYS had difficulty locating the child thereafter. *See* N.T., 9/26/22, at 21.

[4] Father has an extensive criminal history, including convictions for, *inter alia*, simple assault, accidents involving death or personal injury, defiant trespass,
*(Footnote Continued Next Page)*

November 2021, and established a permanency goal of return to parent or guardian and a concurrent goal of adoption. *See* N.T., 9/26/22, at Ex. 11, p.7.

In furtherance of the permanency goals of reunification, CYS established goals for Parents, including, *inter alia*: meet and cooperate with the CYS caseworker and follow all recommendations; maintain involvement with the Children's placement programming and follow all recommendations; meet and cooperate with service providers regarding the Children's wellbeing and development and follow all recommendations; cooperate and follow all recommendations of approved in-home service providers; maintain a safe and clean home with "appropriate sleeping arrangements for a minimum of [six] months"; cooperate with domestic violence services and follow all recommendations; and obtain counseling services "to address emotional needs and ability to cope with anxiety[,] aggression[,] frustration[,] depression[,] *etc*[.], and follow recommendations of provider." N.T., 1/9/23, Ex. 14 at 16; *see also id*. at 43, 46, 50.

In September 2022, CYS filed petitions for the involuntary termination of Parents' parental rights. The trial court held bifurcated evidentiary hearings

---

summary harassment, and fleeing or attempting to elude an officer. *See*, *e.g.*, N.T., 9/26/22, Ex. 5. Notably, he was incarcerated from August 30, 2021, until October 22, 2021. *See id*. at 20-21. He was again incarcerated from March 16-21, 2022 on charges of simple assault, which remained outstanding at the time of the subject proceedings. *See id*. at 26.

on September 26, 2022, and January 9, 2023. By the September date, J.O.M.T.W. and E.L.M.T.W. were five years' old, and one year old, respectively; J.J.M and J.E.M. were four years' old; and Z.K.C.M. was two years' old. Parents were present and represented by counsel. The Children were represented by a guardian *ad litem* ("GAL") and legal counsel.[5] At the conclusion of the first termination hearing, the court continued the matter "to allow the parents to further prove that they can complete all necessary goals." *Id*. at 233. While transition to partially unsupervised visitation occurred in December 2022, visitation returned to fully supervised shortly thereafter. *See* N.T., 1/9/23, at 7, 22, 25-26, 29-30.

At the second termination hearing, on January 9, 2023, CYS presented the testimony of Barry Stewart, a family therapist with Pressley Ridge, as well as foster care supervisor, Angelica Farrisi. Parents again each testified on their own behalf. Ms. Farrisi testified that Parents had made no progress since the prior hearing. *See* N.T., 1/9/23, at 50. While Parents had completed some goals, Ms. Farrisi noted that multiple goals still remained outstanding or incomplete. Mother, among other things, had failed to complete the following: meet and cooperate with CYS and follow all recommendations; maintain a safe

---

[5] At the September 2022 hearing, CYS presented the testimony of CYS foster care caseworker, Ashley Weaber, and Liz Rojas-Gomez and Scott Birchman of Youth Advocate Programs Incorporated, who supervised visits between Parents and the Children. Parents each testified on their own behalf.

and clean home with appropriate sleeping arrangements;[6] cooperate with domestic violence intervention; and complete counseling. *See id*. at 62-63. Ms. Farrisi further noted that the Children were not being fed the appropriate foods. *See id*. at 65-67. She stated, "Nearly every visit they're given an extreme amount of sugar and sweets and high-sugared juices, despite recommendations against that." *Id*. at 66.

Ms. Farrisi further testified that she had been the intake worker when concerns about J.O.M.T.W. first came in, which was approximately two-and-a-half years before the January 2023 hearing, and throughout the pendency of the case, and she stated her observations of Parents' cooperativeness as follows:

> I would say throughout this case since I've had it, there have been times where they've been humble and [they're] willing and receptive. [However,] recently it's been indicative of their initial behavior. They're refusing to follow recommendations, fighting all of the recommendations, accusing CYS of a number of maltreatment concerns. . . ..

*Id*. at 42. Ms. Farrisi further described Parents as "combative" and unreceptive to suggestions at a December 2022 meeting. *Id*. at 33.

Mr. Stewart, the family therapist, testified that he commenced in-home services, which included a domestic violence curriculum, with the family on

---

[6] Regarding the housing goal: Parents failed to have the appropriate separation and/or partition between their bed in the living room and the Children's bedrooms, and to have appropriate mattresses and clean sheets for the Children. *See* N.T., 1/9/23, at 48, 63, 65.

August 17, 2022. *See id*. at 6. He explained, "We had started that with a power and control wheel that talks about dynamics between a couple and what that looks like and areas that need to be addressed in terms of control, things like that . . .." *Id*. at 8. However, Mr. Stewart testified that he ceased his services in December 2022 after a session at Parents' home during which he learned that Parents were videotaping the meeting, and Father exhibited behavior which Mr. Stewart viewed as attempting to intimidate him. *See id*. at 9-10, 132, 137. A subsequent meeting including Parents, Mr. Stewart, and CYS "didn't go well," and Mr. Stewart did not resume services. *Id*. at 11. Mr. Stewart explained, "[W]e tried to talk about some things we needed to see in terms of just what respect looks like. [Father] was escalated. That was pointed out several times. He continued to talk over people and was not really -- I didn't feel he was able to listen to the feedback that we had and what we needed." *Id*. Mr. Stewart indicated that he observed this "controlling" behavior directed toward providers or "authority figures." *Id*. at 16, 18. As a result, for the first time in twenty-five years, Mr. Stewart required a behavior contract in order to continue services with Parents. *See id*. at 12-13, 20, 132.[7]

---

[7] As to the behavior contract, Mr. Stewart testified, "I need things to be very clear about what's expected and about what won't be tolerated, including videotaping." N.T., 1/9/23, at 12. Ms. Farrisi's observations confirmed the conflict between Parents and Pressley Ridge. *Id.* at 69.

Additionally, although Parents indicated that they were receiving counseling through their church, Ms. Farrisi noted their resistance to counseling and refusal to provide any information. *See id*. at 34. Mother had difficulty recalling the name of the church and pastor. *See id*. at 88-89. Father provided the name of the pastor but also had difficulty recalling the name of the church. *See id*. at 122. He testified that he and Mother had not participated in a session since November 2022. *See id*. at 140.[8]

At the conclusion of the subject proceedings, J.O.M.T.W., J.E.M., J.J.M., and Z.K.C.M. had been placed for over year and a half, and E.L.M.T.W. for over a year, in pre-adoptive foster homes. *See id*. at 53; *see also* N.T., 9/26/22, at 17-18. Ms. Farrisi testified that the Children were happy to see Parents, whom they referred to as "Mom" and "Big Wolf," respectively. *See* N.T., 9/26/22, at 53-54, 102; *see also* N.T., 1/9/23, at 16-18, 22 (Mr. Stewart testifying to his observations of Parents' affection toward the Children, and recollecting that "one of the younger[]" Children was sad or upset to have to leave Parents).[9] Further, Ms. Farrisi, as well as Liz Rojas-Gomez of Youth

_____

[8] Mother had also previously asserted that she "didn't need to sign a release for the couple's counselor . . . because no matter what they talk about in couple's counseling, it was not CYS's business either." N.T., 1/9/23, at 37.

[9] Father "prefers to be called Big Wolf. He considers the [C]hildren his pack and calls them cubs." N.T., 9/26/22, at 108. While the Children who could speak, including J.O.M.T.W. referred to their foster parents by their first names, they occasionally slipped and called their foster mothers "Mom," or Mother and Father by their first names. *See id.* at 76, 102.

Advocate Programs Incorporated, acknowledged expressions or inquiries by the Children related to returning home. ***See*** N.T., 1/9/23, at 53-54; ***see also*** N.T., 9/26/22, at 106-07. However, Ms. Weaber opined that foster parents provide the Children "stability and permanence" and "ensur[e they] get their necessary services or evaluations." N.T., 9/26/22, at 61. Ms. Farrisi further stated that, following visitation with Parents, the Children are happy to see their foster parents. ***See*** N.T., 1/9/23, at 53-54. Ms. Rojas-Gomez observed similarly. ***See*** N.T., 9/26/22, at 106. ("They did not seem sad [to leave their parents' home]. They would be happy when they'd see the foster parents and hug the foster parents[] and hug . . . [P]arents goodbye."). Further, the Children are in close proximity and see each other frequently. As Ms. Farrisi explained, "They are friends, the foster parents, so they do see the children outside of visits, at least two to three times a week outside of the visits." N.T., 1/9/23, at 52-53.

In addition, Ms. Farrisi related concerning behaviors by the Children, particularly the boys, following visits and telephone calls, as well as instigating behavior by Parents. Ms. Farrisi testified:

> Q. Do any of the [C]hildren exhibit behaviors before or after visits that require extra support or are of concern?
>
> A. I would say the behavior of the boys has reportedly gotten more intense after visits. Specifically [J.E.M.], and [Z.K.C.M.] as well. [Z.K.C.M.] started exhibiting head banging after visits, more breakdowns. [J.E.M.] gets more emotional, more revved up after calls and after visits and during calls sometimes. It's been noted that bio parents seem to provoke behavior, such as spitting or taking items from each other during visits. During

one of the calls [Z.K.C.M.] had -- [J.E.M.] had taken something from [Z.K.C.M.]. Parents had encouraged him to take it, and then [Z.K.C.M.] was crying and they were essentially making fun of [Z.K.C.M.] for crying.

N.T., 1/9/23, at 41.

Ms. Farrisi ultimately opined that it was in the Children's best interests to terminate parental rights:

Q. And based on your entire experience with [Parents], and everything you have seen, at this point do you think it's in the [C]hildren's best interest to move forward with the termination?

A. I think they deserve permanency. I think the back and forth is really hard for them. And at this time, I don't think [P]arents have shown that they can comply with what needs to be complied with. Given that, I would say yes.

*Id*. at 53.

By decrees issued January 9, 2023, the trial court involuntarily terminated Parents' rights to J.O.M.T.W. and E.L.M.T.W, and, additionally, Mother's rights to the twins and Z.K.C.M. Thereafter, on February 3, 2023, Mother, through appointed counsel, filed timely notices of appeal from the orders terminating her parental rights, along with concise statements of errors

complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[10] The trial court likewise complied with Pa.R.A.P. 1925.[11]

Mother raises the following issue for our review:

Whether the trial court erred when it entered an order on January 9, 2023 terminating [Mother's] parental rights?

Mother's Brief at 7 (unnecessary capitalization omitted).

Our standard of review is as follows:

[I]n cases involving involuntary termination of parental rights[, our review] is limited to determining whether the trial court's determination is supported by competent evidence. When applying this standard of review, an appellate court must accept the findings of fact and credibility determinations of the trial court if they are supported by evidence of record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion. An abuse of discretion is found where there is a demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. It matters not that an appellate court might have reached a different conclusion, as it is well-established that absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand.

_____

[10] Mother's appeals were consolidated by this Court *sua sponte* on March 6, 2023.

[11] We note with disapproval that neither the GAL nor legal counsel filed a brief with this Court. However, at the conclusion of the subject proceedings, the GAL recommended that the court grant CYS's petitions with respect to Parents. *See* N.T., 1/9/23, at 144-46. The Children's legal counsel was unable to ascertain a preference. *See id*. at 146-47. However, presently, the Children's legal counsel, while declining to file a brief, has opined that the Children would concur with Mother's assertion of error. *See* Letter, 4/10/23.

*In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021) (internal citations omitted).

In her sole appellate issue, Mother challenges the termination of her parental rights. Pennsylvania's Adoption Act ("the Act") governs involuntary termination of parental rights proceedings. *See* 23 Pa.C.S.A. §§ 2101-2938. Subsection 2511(a) provides grounds for the involuntary termination of parental rights. If the trial court finds clear and convincing evidence supporting the existence of one of the grounds for termination set forth in subsection (a), the court must then consider whether termination would best serve the child under subsection (b). *See id*. § 2511(b). This Court need only agree with one of the grounds set forth in subsection (a) to affirm, provided subsection (b) is also satisfied. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004).

Here, the trial court involuntarily terminated Mother's parental rights to the Children pursuant to section 2511(a)(1), (2), (5), (8), and (b). *See* Trial Court Opinion, 2/16/23, at 23. As we need only agree with the trial court's determination as to any one section of 2511(a), we limit our discussion to sections 2511(a)(2) and (b), which provide as follows:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * * *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without

essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \* \*

**(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

The grounds for termination of parental rights under section 2511(a)(2) due to parental incapacity are not limited to affirmative misconduct; those grounds may also include acts of refusal and incapacity to perform parental duties. *See In re S.C.*, 247 A.3d 1097, 1104 (Pa. Super. 2021), *abrogated on other grounds by In re K.T.*, --- A.3d ----, 2023 WL 4092986 at \*16 n.23 (Pa. 2023). Section 2511(a)(2) "emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being," especially "where disruption of the family has already occurred and there is no reasonable prospect for reuniting it." *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010) (internal citation and emphasis omitted). We have long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental

responsibilities. *See In re Adoption of M.A.B*., 166 A.3d 434, 443 (Pa. Super. 2017). At a termination hearing, the trial court may properly reject as untimely or disingenuous a parent's vow to follow through on necessary services when the parent failed to cooperate with the agency or take advantage of available services during the dependency proceedings. *See In re S.C*., 247 A.3d at 1105.

Mother argues that she "worked to the best of her ability" to complete her goals, and asserts that her parenting of the Children was satisfactory as evinced by the fact that no dependency or termination matters were open vis-à-vis her youngest child. *See* Mother's Brief at 24-25. Mother argues she had no concerns for her safety at the hands of Father, and she found counseling with Mr. Stewart and with her pastor "helpful." *See id*. at 25. She contends she has "consistently maintained her desire to resume the parental responsibilities for her children." *Id*. at 24.[12]

---

[12] We note, initially, that despite the trial court finding grounds for termination pursuant to several subsections—which the court noted in its Rule 1925(a) opinion which preceded Mother's brief—Mother, in her argument, does not analyze any particular subsection of 2511(a). *See* Mother's Brief at 22-26. We could thus conclude that any assertion of error as to section 2511(a)(2) is waived for failure to address this issue in a meaningful way with citation to pertinent legal authorities in his brief. *See In re W.H*., 25 A.3d 330, 339 n.3 (Pa. Super. 2011) (holding that where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived); *see also In re M.Z.T.M.W*., 163 A.3d 462, 465-66 (Pa. Super. 2017) (explaining this Court will not review an appellant's claim unless it is included in both the concise statement of errors complained of on appeal and statement

*(Footnote Continued Next Page)*

In concluding that CYS satisfied the statutory grounds to terminate Mother's parental rights pursuant to, *inter alia*, section 2511(a)(2), the trial court found as follows:

> . . . [W]hile [Parents] completed some of their goals such as being employed and Father completing a parenting class, [Parents] failed to follow recommendations, failed to complete many important goals, and were unwilling to complete them. [Parents] were not sufficiently involved in the placements. [Parents] were not setting a good example for behavior. [Parents] did not feed the [] Children appropriately. While [Parents] made significant progress on their housing situation, the goal remained uncompleted. Father has a concerning anger issue that has not been resolved. . . . [CYS] was concerned about the severity of Father's usage of marijuana. There are concerns of possible domestic violence and dishonesty in these cases. Lastly, [Parents] were resistant to couples counseling. Again, th[e c]ourt notes that [Parents'] overall unsatisfactory conduct persisted over the whole history of these cases; at least thirteen months had passed since E.L.M.T.W. was adjudicated dependent and twenty-six months had passed since the rest of the [] Children were adjudicated dependent.

> * * * *

> . . . [A]ll of the . . . Children have . . . been waiting in the legal and physical custody of [CYS] for at least thirteen months by the January 9, 2023[] hearing. [Parents] did not make much progress regarding [CYS's] overall main concerns for [them] when considering the totality of the record. Additionally, no goals had been completed since September [] 2022[,] when [the c]court gave [Parents] additional time to try to improve the situation. [Parents'] resistance to making improvements that [CYS] recommended troubled th[e c]ourt. [Parents] . . . could have . . replaced the . . . Children's sheets and mattresses, signed the behavioral contract to resume [Mr.] Stewart's services, and signed the release for the alleged pastor to speak with [CYS] about these

of questions involved and developed in his or her argument and supported by citation to relevant legal authority).

- 16 -

cases. However, [Parents] chose to not comply with any of these recommendations . . ..

* * * *

Th[e c]ourt notes that [Parents] did make progress on some of their goals[,] and th[e c]ourt considered their progress. This [c]ourt was pleased that [Parents] were both employed, that Father completed a parenting class, that [Parents] almost had a sufficient home, and that [Parents] had a bond with the [] Children. [. . .] However, [Parents] did not make much progress on important goals that mattered and failed to follow recommendations; the overall major concerns of [Parents] not following recommendations, being dishonest, and possibly violent[,] remained.

Trial Court Opinion, 2/16/23, at 24-25, 29-30 (citations to the record omitted).

Based on the foregoing, we discern no abuse of discretion by the court in concluding that grounds existed for termination of Mother's parental rights pursuant to section 2511(a)(2). Mother, *inter alia*, did not complete the domestic violence intervention; exhibited a lack of cooperation with the family's counselor, Mr. Stewart; and failed to follow agency recommendations, including, for example, obtaining appropriate bedding and food for the children. The record thus demonstrates that Mother's repeated and continued incapacity, neglect or refusal to comply with their permanency plan reunification goals has caused the Children to be without essential parental care, control, or subsistence necessary for their physical or mental well-being. Further, despite the trial court continuing the matter from September 2022 to January 2023, no additional goals were completed, which demonstrates that

the conditions and causes of this refusal cannot or will not be remedied. ***See***

***In re Adoption of M.E.P.***, 825 A.2d 1266, 1272 (Pa. Super. 2003). As this

Court has stated, "[A] child's life cannot be held in abeyance while a parent

attempts to attain the maturity necessary to assume parenting

responsibilities. The court cannot and will not subordinate indefinitely a child's

need for permanence and stability to a parent's claims of progress and hope

for the future." ***In re Adoption of R.J.S.***, 901 A.2d 502, 513 (Pa. Super.

2006).[13]

Having found sufficient grounds for termination pursuant to section

2511(a)(2), we next must determine whether termination was proper under

section 2511(b), which affords primary consideration to the developmental,

physical and emotional needs and welfare of the child. ***See T.S.M.***, 71 A.3d

at 267. Regarding the section 2511(b) best interest analysis, this Court has

explained:

> While a parent's emotional bond with his or her child is a
> major aspect of the subsection 2511(b) best-interest analysis, it
> is nonetheless only one of many factors to be considered by the
> court when determining what is in the best interest of the child.

---

[13] Regarding Mother's argument that her ability to parent her infant evinces her ability to appropriately parent the Children, subsection (a)(2) covers incapacity, neglect, and ***refusal***; here, the ***supra*** evidence amply demonstrates Mother's refusal to parent the Children, notwithstanding her asserted capacity to parent her then-newborn child. ***Cf***. ***In re S.K.L.R.***, 256 A.3d 1108, 1124 (Pa. 2021) (holding that a parent's ability to parent a younger sibling is relevant and admissible in termination of parental rights proceedings for older siblings, but that the fact-finder must, as with other admitted evidence, determine the appropriate weight to assign to that evidence).

> The mere existence of an emotional bond does not preclude the termination of parental rights. Rather, the [trial] court must examine the status of the bond to determine whether its termination would destroy an existing, necessary and beneficial relationship. . . ..
>
> In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, . . . the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (internal citations, quotations, brackets, and indentation omitted). Furthermore, our Supreme Court has stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d 251, 268 (Pa. 2013). In weighing the bond considerations pursuant to section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id*. at 269. Children "are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id*. As our Supreme Court recently explained in *K.T.*,

> a court conducting a [s]ection 2511(b) analysis **must consider more than proof of an adverse or detrimental impact** from severance of the parental bond. We emphasize analysis of the parental bond is but one part of the overall subsection (b) analysis, which includes a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare.

- 19 -

2023 WL 4092986 at *18 (emphasis added). In addition, the **K.T**. Court explained that the inquiry **must** consider and weigh certain evidence if it is present in the record, including, but not limited to, the child's "need for permanency and length of time in foster care . . .; whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability." **Id**. (footnote omitted).

Mother argues the trial court abused its discretion in concluding that termination of her parental rights was in the best interests of the Children pursuant to section 2511(b). Mother's argument hinges on the Children's bond to her. **See** Mother's Brief at 25. She notes her own enjoyment of "doing [the Children's] hair," and that she has provided clothing and appropriate housing for them. **See id**. at 25-26. She lastly expresses "concern[] about the [C]hildren['s] separation from each other and their parents." **See id**. at 26.

In concluding that termination of Parents' parental rights best serves the Children's developmental, physical, and emotional needs and welfare pursuant to section 2511(b), the trial court stated:

> This [c]ourt notes that [Parents] do share a bond with the []
> Children, but th[e c]ourt does not find that this bond is necessary
> or beneficial. Th[e c]ourt . . . notes that the [] Children are happy
> to see [Parents]. However, this [c]ourt found that the termination

of [Parents'] parental rights would best serve the needs and welfare of the [] Children because of the following[:] The [] Children are also happy to see the foster parents. [. . .] The current foster parents are adoptive resources. While the boys are in one home and the girls are in another, the foster parents of both homes are friends, so the [] Children see each other many times each week. The caseworker who worked on the case for approximately two-and-one-half years testified that it is in the [] Children's best interest to terminate the parental rights. The [] Children deserve permanency, and moving back and forth is really difficult for them. Lastly, [Parents] have not shown that they can comply with [CYS's] require[ments]. . . . [Parents'] parental rights to the custody and rearing of the [] Children were converted, upon the failure to fulfill their parental duties, [considering] the [] Children's rights to have proper parenting and fulfillment of their potential in a permanent, healthy, and safe environment. E.L.M.T.W. had been involved with [CYS] for at least thirteen months by the January 9, 2023, hearing, and [J.O.M.T.W. was] involved with [CYS] for at least twenty-six months by that date. The developmental, physical, and emotional needs as well as the welfare of the [] Children are all being addressed better by the foster parents.

Trial Court Opinion, 2/16/23, at 28-29 (citations omitted).

Following our review, we discern no abuse of discretion by the trial court. As CYS foster care supervisor Ms. Farrisi testified to, while Children have a bond with Parents, they are also bonded to their preadoptive foster parents, who are better able to provide for the Children's developmental, physical, and emotional needs, and facilitate contact among the siblings; whereas Mother has, despite ample opportunity, failed to show she can provide the requisite stability. As Mother has failed to show the trial court abused its discretion in finding grounds for termination pursuant to section 2511(a)(2), or in its determination that termination of her parental rights best serves the Children's developmental, physical, and emotional needs and welfare pursuant

to section 2511(b), she is due no relief.  For the foregoing reasons, we affirm the termination decrees.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 08/11/2023